IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 25-cv-00418-GPG-CYC

TUMAINE UTOLITI,

    Petitioner,

v.

DAWN CEJA, in her official capacity as warden of the Aurora Contract Detention Facility;
ROBERT GUADIAN, in his official capacity as Field Office Director, Denver, U.S. Immigration and Customs Enforcement;
BENJAMINE HUFFMAN, in his official capacity as Acting Secretary, U.S. Department of Homeland Security;
CALEB VITELLO, in his official capacity as Acting Director of Immigration and Customs Enforcement; and
JAMES MCHENRY, in his official capacity as Acting Attorney General of the United States;

    Respondents.

## ORDER

Before the Court are Petitioner Tumaine Utoliti's (Petitioner) Verified Petition for Writ of Habeas Corpus (the Habeas Petition) (D. 1), Petitioner's Motion for Temporary Restraining Order (the TRO Motion) (D. 2), and Petitioner's Unopposed Motion for Status of Temporary Restraining Order (the Motion for Status Update) (D. 19). Petitioner—a noncitizen currently detained in Immigration and Customs Enforcement (ICE) custody—claims that the Fifth Amendment to the United States Constitution entitles him to release or an individualized bond hearing through which he could challenge his custody.[1] But because Petitioner is in ongoing removal proceedings, and

---

[1] Though the Court recognizes that the Immigration and Nationality Act and many cases use the term "alien" to refer to noncitizens, the Court prefers and will use the term "noncitizen," except where quoting the parties' briefing, a

1

because there is no indication that dilatory government conduct has delayed those proceedings, Petitioner's continued custody comports with the Fifth Amendment. Accordingly, the Court DENIES Petitioner's Habeas Petition and DENIES AS MOOT Petitioner's TRO Motion and Motion for Status Update.

## I. FACTUAL BACKROUND

Petitioner—a 25-year-old man—was born in a Ugandan refugee camp to Congolese parents (D. 1 at 5). He lived in Uganda for around 17 years (*id.*). While living there, he experienced severe mistreatment at the hands of Ugandan police (*id.*). In 2016, Petitioner was admitted to the United States as a refugee (*id.*). The United States also admitted Petitioner's parents and nine younger siblings (*id.*). Petitioner and his family settled in Phoenix, Arizona (*id.*). And in January 2019, Petitioner became a lawful permanent resident of the United States (*id.*).

Soon afterwards, Petitioner got into trouble with the law. On June 10, 2020, he went out drinking with friends (*id.* at 6). As he attempted to drop one of his friends off at home, Petitioner, who was under the influence of alcohol, saw a police car, panicked, and fled in his vehicle— coming close to police officers when he passed them (*id.*). After this incident, Petitioner pled guilty to one count of attempt to commit aggravated assault on law enforcement under Arizona Revised Statutes § 13-1304(a)(2) and one count of unlawful flight from a law enforcement vehicle under Arizona Revised Statutes § 28-622.01 (*id.*).

Petitioner was sentenced to three years of probation for his convictions (*id.*). One of the

---

statute, or a case. *See Williams v. Garland*, 59 F.4th 620, 624 n.1 (4th Cir. 2023) ("We use 'noncitizen' in place of the statutory 'alien,' which has been recognized as an 'archaic and dehumanizing' term." (quoting Maria Sacchetti, *ICE, CBP to Stop Using 'Illegal Alien' and 'Assimilation' Under New Biden Administration Order*, Wash. Post (Apr. 19, 2021), https://www.washingtonpost.com/immigration/illegal-alien-assimilation/2021/04/19/9a2f878e9ebc-11eb-b7a8-014b14aeb9e4_story.html)).

terms of his probation was that he was not allowed to leave Arizona (*id.*). But on a check-in call with his probation officer, Petitioner revealed that he had left Arizona (*id.*). The state court handling Petitioner's criminal case found that Petitioner had violated his probation's terms and sentenced Petitioner to four months in jail (*id.*).

In December 2022, ICE officers interviewed Petitioner at the local jail where he was held on the probation violation (D. 8-1 at 2). They asked about his immigration status and decided that he was removable (*id.*).

On April 15, 2023, after Petitioner was released from jail, the Department of Homeland Security detained Petitioner and served him with a Notice to Appear (NTA) (*id.*). The NTA charged that Petitioner was removable under 8 U.S.C. § 1227(a)(2)(A)(i) because his attempted assault conviction constituted a crime of moral turpitude and had been committed within five years of entry (*id.* at 2–3).

Petitioner requested release on bond (*id.* at 3). He appeared on April 25, 2023 for a custody hearing before an IJ, at which he withdrew his bond request and asked for further time to consult with an attorney and prepare (*id.*). The IJ granted this requested extension (*id.*). On April 27, 2023, Petitioner appeared for a further hearing before the IJ (*id.*). At that hearing, Petitioner admitted to the NTA's allegations (*id.*). On May 17, 2023, Petitioner appeared before the IJ once again (*id.*). The IJ sustained the charge of removal and set an individual merits hearing on Petitioner's applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT) for June 9, 2023 (*id.* at 3–4). The IJ also considered a request for release on bond, which he denied on the ground that 8 U.S.C. § 1226(c) required Petitioner's detention (*id.* at 4).

3

On June 9, 2023, Petitioner appeared for his individual merits hearing (*id.*). The IJ denied Petitioner's applications for relief or protection from removal and ordered Petitioner removed to Uganda, or in the alternative, the Democratic Republic of the Congo (*id.*).

On June 20, 2023, Petitioner appealed the IJ's decision to the Board of Immigration Appeals (BIA) (*id.*). But he did not contest the IJ's finding that he was removable (D. 1 at 8–9).

The BIA issued a briefing schedule on July 10, 2023, setting a briefing deadline of July 31, 2023 for both Petitioner and the government (D. 8-1 at 4). On July 28, 2023, Petitioner asked for an extension of this deadline, which the BIA granted on August 1, 2023 (*id.*). The BIA set a new deadline of August 21, 2023 for Petitioner's brief (*id.*). Petitioner filed his brief (as well as a motion to accept his late-filed brief) on August 22, 2023 (*id.*). The BIA accepted Petitioner's brief, and, on September 21, 2023, affirmed the IJ's decision and dismissed Petitioner's appeal (*id.*).

On October 13, 2023, Petitioner filed a petition for review with the United States Court of Appeals for the Ninth Circuit (*id.* at 5). While the petition for review was pending, ICE conducted a Post Order Custody Review of Petitioner's case under 8 C.F.R. § 241.4 (*id.*). It determined that Petitioner posed a risk to public safety in view of his criminal convictions, and that there was a significant likelihood that Petitioner would be removed in the reasonably foreseeable future (*id.*).

On January 19, 2024, the Ninth Circuit stayed Petitioner's removal (D. 1 at 8). Petitioner filed a further request for release on bond with immigration authorities on March 12, 2024 (D. 8-1 at 5). One week later, on March 19, 2024, the IJ held a hearing on this request (*id.*). She concluded that Petitioner was not eligible for bond because he was mandatorily detained under 8 U.S.C. § 1226(c) (D. 1-1 at 183). In the alternative, she found that even if Petitioner were eligible for a bond, release would not be appropriate because he is both a "flight risk and a danger to

4

persons and property" (*id.*). In support of this finding, the IJ cited Petitioner's criminal history, describing it as "recent and egregious" (*id.*).[2]

Petitioner appealed the IJ's bond decision to the BIA (D. 8-1 at 5). The BIA affirmed the IJ's decision on June 13, 2024, agreeing with the IJ that Petitioner's status as a mandatory detainee under 8 U.S.C. § 1226(c) precluded his release on bond (D. 1-1 at 179).

On April 19, 2024, Petitioner filed an opening brief before the Ninth Circuit in support of his petition for review (D. 1 at 8). This brief asserted various arguments that Petitioner had not presented to the BIA, including that Petitioner was not removable as charged (*id.* at 8–9). In its answering brief, filed on June 3, 2024, the government contended that the Ninth Circuit couldn't consider these arguments because they had not been asserted before the BIA (*id.* at 9). In an attempt to address this issue, Petitioner filed a motion to reopen before the BIA on July 22, 2024 (*id.*). This motion contended that Petitioner's prior counsel at the BIA level had ineffectively assisted Petitioner (*id.*). The BIA denied the motion on September 30, 2024 (*id.*).

Petitioner filed a second petition for review with the Ninth Circuit on October 1, 2024, requesting that the Ninth Circuit review the BIA's denial of his motion to reopen (*id.*). On October 8, 2024, the Ninth Circuit consolidated this petition for review with Petitioner's first petition for review (*id.*). Both petitions for review remain pending as of the date of this Order.

Petitioner is currently in ICE custody at ICE's Aurora, Colorado, detention facility (D. 1 at 9). ICE has kept Petitioner detained, as of the date of this Order, for 775 days.

Petitioner filed the instant Habeas Petition and TRO Motion on February 7, 2025 (D. 1; D.

---

[2] In addition to referencing the conduct forming the basis of Petitioner's attempted aggravated assault on a peace officer and fleeing a police vehicle convictions, the IJ referenced separate felony assault on a peace officer, resisting arrest, and menacing charges arising from an apparently earlier incident (D. 1-1 at 183).

2). Respondents—various government officials Petitioner is suing in their official capacities—responded to Petitioner's TRO Motion on March 3, 2025 (D. 8). Also on March 3, 2025, this matter was assigned to the undersigned (D. 9). Four days later, on March 7, 2025, Petitioner filed a reply brief in support of his TRO Motion (D. 15). The TRO Motion is thus fully briefed.

On March 26, 2025, Petitioner filed an update with the Court indicating that the conditions of Petitioner's custody are negatively impacting his mental health (D. 18). And on April 27, Petitioner filed the Motion for Status Update (D. 19).

## II. LEGAL STANDARDS

Under 28 U.S.C. § 2241, a district court may issue a writ of habeas corpus if the petitioner is held "in custody in violation of the Constitution or laws or treaties of the United States." Habeas is an appropriate vehicle for challenging the constitutionality of immigration detention. *See Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas." (citing *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001))); *Diaz-Ceja v. McAleenan*, No. 19-CV-00824-NYW, 2019 WL 2774211, at *3 (D. Colo. July 2, 2019) ("Federal courts have habeas jurisdiction to examine the statutory and constitutional bases for immigration detention unrelated to a final order of removal.").

## III. ANALYSIS

Petitioner and Respondents agree that ICE is detaining Petitioner under 8 U.S.C. § 1226(c). Section 1226(c) is a provision of the Immigration and Naturalization Act (INA) that requires immigration officials to take into custody and detain noncitizens who have committed certain criminal offenses or who have engaged in certain terrorist activities. *See Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (describing § 1226's structure). It provides, among other things, that

"[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D)" of Title 8 of the United States Code. And under 8 U.S.C. § 1227(a)(2)(A)(iii), "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." Here, both the IJ and BIA concluded that Petitioner had been convicted of an aggravated felony, and that § 1226(c) thus mandated his detention.[3]

Petitioner argues that § 1226(c) is unconstitutional as applied to him under a six-factor test that other judicial officers in this District have applied to challenges § 1226(c) detentions. Under Petitioner's proposed test, the constitutionality of continued detention depends on:

   (1) the total length of detention to date;
   (2) the likely duration of future detention;
   (3) the conditions of detention;
   (4) delays in removal proceedings caused by the detained person;
   (5) delays in the removal proceedings caused by the government; and
   (6) the likelihood that removal proceedings will result in a final order of removal.

(D. 1 at 19 (citing *Daley v. Choate*, 22-cv-03043-RM, 2023 WL 2336052, at *3 (D. Colo. Jan. 6, 2023)). Petitioner contends that these factors largely favor him, because (1) he has been detained for over two years; (2) he will potentially remain detained for many more months, or potentially years, while he pursues his appellate remedies; (3) ICE's Aurora, Colorado facility resembles a penal institution; (4) he has not engaged in dilatory tactics (and cannot be punished for exercising his appellate remedies); and (5) he is likely to obtain relief via termination of his removal proceedings, or via his asylum, withholding of removal, or CAT claims. Petitioner concedes, however, that the government has not caused any delay in his pending removal proceedings.

---

[3] Petitioner disputes that he has committed an aggravated felony. And he contends that he is thus erroneously detained under § 1226(c). But he does not argue that he is not detained under § 1226(c).

7

Respondents counter that *Demore v. Kim*, 538 U.S. 510 (2003) validates Petitioner's continued detention during his ongoing removal proceedings and that it is thus unnecessary for the Court to engage with Petitioner's proposed multi-factor test. Respondents also argue that, even if Petitioner's test did apply, the tests' factors would generally resolve in Respondents' favor.

Recently, this Court held that "at least as a general matter, the government may detain a noncitizen during ongoing . . . removal proceedings." *See Bonilla Espinoza v. Ceja*, 25-cv-01120 (D. Colo. May 21, 2025), ECF No. 11 at 21. This holding acknowledged *Demore*'s conclusion that "'detention during removal proceedings is a constitutionally permissible part of that process'—even when a noncitizen is detained for longer-than-average-periods." *Id.* at 20 (quoting *Demore*, 538 U.S. at 531). The Court recognized, however, that Justice Kennedy's fifth-vote *Demore* concurrence leaves open the possibility of an as-applied due process challenge predicated on government-caused delay:

> This Court's takeaway from Justice Kennedy's *Demore* concurrence is that, so long as the government reasonably affords noncitizen detainees in ongoing immigration proceedings administrative process to challenge the merits determinations that are keeping them in custody, continued custody is permissible. In other words, "[p]erhaps it's possible that detention[s]" under §§ 1225(b) and 1226(c) "might become unreasonable if the government . . . arbitrarily extends or suspends" detention, removal, or asylum proceedings. *Aguayo* [*v. Martinez*, No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, at *4 (D. Colo. May 12, 2020)].

*Id.* at 22. Consistent with its analysis of *Demore* (including Justice Kennedy's concurring opinion), the Court rejected the petitioner's argument that the Court ought to apply the exact same six-factor due process test Petitioner asks it to apply here:[4]

---

[4] The Court also noted that developments post-dating the first in-district opinion adopting this test have undercut its continued vitality. *See Bonilla Espinoza v. Ceja*, 25-cv-01120 (D. Colo. May 21, 2025), ECF No. 11 at 24 n.10. Specifically, in *Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024), the United States Court of Appeals for the Eighth Circuit abrogated the district court opinion from which this test came, determining that the Supreme Court's

> [I]n the Court's view, this test cannot be squared with either the majority opinion in *Demore* or Justice Kennedy's *Demore* concurrence. *Demore* generally validated detentions during the pendency of ongoing immigration proceedings, and Justice Kennedy's concurrence was clear that it is arbitrary government delay in moving proceedings along that potentially triggers a due process problem. Unless that prerequisite were satisfied, the Court would decline to engage in a due process analysis along the lines of that described in [cases laying out the six-factor test]. To the extent that Petitioner's authorities suggest that courts ought to apply this six-factor test whenever a noncitizen's detention hits a certain length, irrespective of what process they have received and when they have received it, the Court respectfully disagrees.

(*Id.* at 24–25).

Here, Petitioner's removal proceedings are ongoing, and Petitioner does not allege that Respondents have engaged in any dilatory conduct that has delayed those proceedings. Under these circumstances, Petitioner's continued detention under § 1226(c) comports with due process. Petitioner thus is not entitled to habeas relief.[5]

---

immigration detention cases "leave no room for a multi-factor 'reasonableness' test." The Court acknowledges that at least one in-District order has expressly declined to apply *Banyee* on weight-of-authority grounds. *See Martinez v. Ceja,* 760 F. Supp. 3d 1188, 1193 n.4 (D. Colo. 2024). But all of the cases that decision cited for this proposition pre-date *Banyee*, and that decision did not address *Banyee*'s merits. And ultimately, *Banyee* hews more closely to this Court's reading of *Demore* than do the cases applying multi-factor reasonableness tests.

[5] The Court also notes that Petitioner's case is somewhat different from the authorities on which he relies. Specifically, it's not the case that Petitioner has been detained for over two years without a bond ruling justifying his continued detention. Rather, an IJ has addressed one of Petitioner's release requests on its merits, concluding based on Petitioner's criminal history that he is a flight risk and a danger to public safety. While the process through which the IJ reached that conclusion might not be as robust as what Petitioner would have preferred, it is still process that otherwise similarly situated habeas petitioners generally have not received. The upshot is that Petitioner's authorities would not necessarily have persuaded the Court that an additional bond hearing were required, even if the Court agreed that Petitioner was using the correct due process test.

In the context of a procedural due process challenge, the process is the point, even when that process has no point. But here, the fact is that an additional bond hearing structured along the lines Petitioner says is required would serve little purpose: there's no reason to think an IJ would reach a different result on a release request this time, regardless of how the bond hearing were structured. Petitioner argues that he is entitled to a bond hearing at which the government bears the burden of establishing that he is a danger to the public or a flight risk. But Petitioner's criminal history is his criminal history—he can't change it. And his attempted assault on a peace officer and flight from a police vehicle convictions are frankly bad convictions for him to have if the question at a bond hearing is whether he is a danger to public safety or a flight risk. The IJ's previous ruling that Petitioner is a risk to public safety and a flight risk based on Petitioner's criminal history gives a pretty strong indication of what an IJ would do with a further release

Petitioner's arguments to the contrary largely depend on an expansive reading of *Zadvydas v. Davis*, 533 U.S. 678 (2001) and a narrow reading of *Demore*.

But *Zadvydas* dealt with a fundamentally different situation than the one at issue here. First, *Zadvydas* implicated a different detention statute: it addressed challenges to post-removal detention under 8 U.S.C. § 1231(a)(6)—not detention during ongoing removal proceedings pursuant to § 1226(c). 533 U.S. at 682. Second, *Zadvydas* addressed claims brought by detainees whom the government had no realistic prospect of deporting. *Id.* at 684–86; *see also Demore*, 538 U.S. at 527 (distinguishing *Zadvydas* on the basis that the *Zadvydas* petitioners' "removal was 'no longer practically attainable'" (quoting *Zadvydas*, 533 U.S. at 690)). These differences matter. Detaining noncitizens during ongoing immigration proceedings serves a valid immigration purpose, while detaining functionally non-deportable noncitizens when there are no more immigration proceedings to be had does not necessarily do so.[6]

*Demore* also does not support Petitioner's due process arguments. It broadly held that "[d]etention during removal proceedings is a constitutionally permissible part of that process." 538 U.S. at 531. It did not hold that "detention during removal proceedings is a constitutionally permissible part of that process" only so long as removal proceedings conclude within a few months. While *Demore* noted the relative brevity of § 1226(c) detentions, in part to underscore

---

request. Simply put, it's hard to imagine an IJ letting a noncitizen with Petitioner's criminal history out of custody. And in that sense, Petitioner's request for a bond hearing is basically academic.

[6] While Petitioner suggests that he might prove difficult to deport in the event he does not succeed on appeal, Petitioner's *Zadvydas*-style claim—to the extent he seeks to assert one—is not yet ripe. *See Bokole v. McAleenan*, No. 1:18-CV-00583-JB-LF, 2019 WL 2024922, at *5 (D.N.M. May 8, 2019) (determining that an unlawful detention claim, to the extent premised on *Zadvydas*, was not yet ripe, and concluding that "[i]f necessary," the petitioner could file a new petition if not removed within the presumptively reasonable six-month period for removal set forth in *Zadvydas*); *Singh v. Barr*, No. 19-CV-01381-STV, 2019 WL 13202230, at *4 (D. Colo. Oct. 25, 2019) (declining to address a *Zadvydas*-style theory on ripeness grounds where the petitioner was not yet even subject to a final order of removal).

10

the differences between those detentions and the potentially indefinite detentions like those at issue in *Zadvydas*, *id.* at 529–31, its holding did not depend on brevity. Instead, the "material[] differen[ce]" that renders detentions under § 1226(c) generally constitutional, and detentions under § 1231(a)(6) potentially unconstitutional, is that a § 1226(c) detention "ha[s] a definite termination point" while a § 1231(a)(6) detention does not. *Id.* at 528–29. In other words, *Demore*'s holding depends on the existence of an endpoint, rather than that endpoint's specific location. The Court does not read *Demore*'s statistical references to narrow its holding to short detentions. Nor does the Court read *Demore* to require a bond hearing here.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that Petitioner's Habeas Petition (D. 1) is DENIED. Because the Court denies the Habeas Petition, it is FURTHER ORDERED that Petitioner's TRO Motion is DENIED AS MOOT (D. 2). *See Aguayo*, 2020 WL 2395638, at *7 (denying TRO request as moot in light of the court's denial of the underlying habeas petition). Moreover, because the Court is denying the Habeas Petition and the TRO Motion, the Court also DENIES AS MOOT Petitioner's Motion for Status Update (D. 19).

The Clerk of the Court is directed to close this case.

DATED May 29, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

11